UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BILLY CORLEY,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CV 1906 DDN |
| | ) | |
| NANCY A. BERRYHILL,[2] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before this court for judicial review of the final decision of the Commissioner of Social Security finding that plaintiff Billy Corley was not disabled, and, thus, not entitled to Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

---

[1] Plaintiff Billy Corley (with SSN   -  -3652 (ECF No. 1 at 1) was formerly known as "Billy Logan" (ECF No. 3) and most of the administrative medical record submitted to the court is in the name of "Billy Logan," "Billy Joe Logan" (*e.g.,* Tr. 316, 391-480) or "Billy Joe Casey Logan" (Tr. 484). The court is satisfied that the administrative record before it relates to plaintiff. (ECF No. 15-3 at 1) (showing SSN   -   - 3652).

[2] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Berryhill is hereby substituted for Carolyn W. Colvin in her official capacity as the defendant in this action. 42 U.S.C. § 405(g) (last sentence).

**BACKGROUND**

Plaintiff, born February 23, 1978, filed his application for SSI on May 17, 2012, alleging a disability onset date of February 1, 2008 due to mental problems, and neck and back pain.[3] (Tr. 200-20). On November 9, 2012, his application was denied; thereafter, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 88, 95). The hearing was held on March 25, 2014.[4] (Tr. 38, 171). Delores Gonzalez, a vocational expert ("VE"), and plaintiff testified at the hearing. (Tr. 20, 38, 189-92). The ALJ decided on July 1, 2014, that plaintiff had the Residual Functional Capacity ("RFC") to perform light work as defined in 20 CFR 416.967(b), with some exceptions. (Tr. 24). Considering plaintiff's age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that plaintiff could perform, and therefore found that plaintiff was not disabled under the Act. (Tr. 29). Plaintiff requested review by the Appeals Council of the Social Security Administration on August 30, 2014. (Tr. 20). The Appeals Council denied the request. (Tr. 1). Plaintiff has exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues the ALJ's decision contained inaccuracies, incomplete analysis, and unresolved conflicts of evidence that demonstrate the ALJ's decision was not based on substantial evidence. Specifically, he asserts the ALJ erred in determining plaintiff's credibility by improperly considering some factors and failing to cite to the record. Plaintiff asks that the ALJ's decision be reversed and the case be remanded for further evaluation of the record.

---

[3] Plaintiff had previously filed applications for Supplemental Security Income benefits on July 16, 2010 and October 29, 2008. The claims were initially denied and plaintiff did not appeal either of those denials.

[4] Plaintiff objected to a hearing by video teleconference on August 23, 2013. (Tr. 170).

**MEDICAL RECORD AND OTHER ADMINISTRATIVE RECORD**

On May 9, 2008, Karen Hampton, Ph.D., a licensed psychologist, prepared a psychological evaluation of plaintiff. (Tr. 306-20). Plaintiff had reported concerns of mental problems, anxiety, panic attacks, and memory problems.[5] (Tr. 316). Plaintiff stated anxiety made it difficult to be around people; however, he continued to do his own basic shopping. (Tr. 316). Plaintiff had placed job applications since his discharge from the Army in December 2006, but had not worked since the discharge. (Tr. 317).[6] Plaintiff had previous employment at a bowling alley, the Dollar Tree, and, immediately prior to his enlistment in the Army, at a pizza place where he worked for over two years. (Tr. 318). Plaintiff had not attended outpatient counseling or psychotherapy, nor had he been psychiatrically hospitalized at any time. (Tr. 319). Dr. Hampton found plaintiff expressed signs of physiological anxiety. (Tr. 317). Dr. Hampton diagnosed plaintiff with bipolar disorder (type unspecified), learning disorder, and dependent and avoidant personality traits. (Tr. 320). Dr. Hampton listed plaintiff's GAF score at 53, consistent with moderate limitations of functioning.[7] (*Id.*). She concluded:

---

[5] The information contained in Dr. Hampton's psychological evaluation was obtained from an April 30, 2008 interview with plaintiff and from review of records. (Tr. 316).

[6] Plaintiff was discharged from the Army 3 months after enlisting. Plaintiff felt judged by his platoon members. Plaintiff stated he resented [his platoon members] for being friendly to him when he left. Plaintiff was not sure of his discharge status other than it being due to the anxiety and depression he was experiencing. (Tr. 318).

[7] A Global Assessment of Functioning ("GAF") score represents a clinician's judgment of an individual's overall ability to function in social or occupational settings, not including impairments due to physical or environmental limitations. *Diagnostic & Statistical Manual of Mental Disorders* (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate some impairment in reality testing or communication or "major" impairment in social or occupational functioning; scores of 41 to 50 reflect "serious" impairment in these functional areas; scores of 51-60 reflect "moderate" impairment; and scores of 61 to 70 indicate "mild" impairment. However, in the fifth edition of the DSM, it was recommended that the GAF be dropped for several reasons, including its conceptual lack of clarity and questionable psychometrics. DSM-5 at 16.

> Based on the results of the current evaluation, Billy is able to understand and recall simple instructions. Concentration is mildly impaired, and pace is adequate compared to other same-age adults. Ability to adapt to social situations and work-like settings is moderately impaired, in what sounds like fairly chronic anxiety and paranoid thoughts, in what may be a bipolar mood disorder or psychotic thought disorder, Billy appears likely to decompensate in the face of increased stressors. He is considered capable of managing funds independently in his own best interest.

(Tr. 320).

On July 15, 2009, plaintiff reported feeling less depressed at a meeting with Ginger Nicol, M.D., a psychiatrist at BJC Behavioral Health Services. (Tr. 347). On July 29, 2009, plaintiff told Dr. Nicol he denied feeling depressed or anxious, and denied problems with sleep. (Tr. 346). Plaintiff demonstrated the ability to consistently take oral medication with assistance from his social worker and a pill box. (Tr. 346).

On August 19, 2009, Dr. Nicol noted improved hygiene, improved social interactions (e.g., riding the bus on his own and attending the Independence Center ("IC")), and a significant decrease in paranoia, anxiety, and depressive symptoms. (Tr. 345). Dr. Nicol noted since taking prescribed medication, psychiatric symptoms improved dramatically. (Tr. 345).

On September 9, 2009, Dr. Nicol noted the social worker checked pill boxes during a home visit and verified plaintiff had been taking prescribed medication; however, it was unclear whether plaintiff took the medication consistently. (Tr. 343). Dr. Nicol found plaintiff's symptoms improved somewhat since changing medication. (Tr. 344).

On October 7, 2009, Dr. Nicol noted plaintiff took medications, attended the IC regularly, and used public transportation without problems. Plaintiff's symptoms were stabilized under medication. (Tr. 342).

On November 11, 2009, plaintiff reported tolerating medication without problems and reported he had not missed any doses since setting up a pillbox and alarm system for reminders. Dr. Nicol noted plaintiff's psychotic and mood symptoms were under good

control and plaintiff participated well in the psychosocial rehabilitation programming. (Tr. 341).

On December 30, 2009, Dr. Nicol noted plaintiff went to the grocery store and to primary care physician appointments alone, remembered to fill his pill boxes weekly, denied any mood or psychotic symptoms, attended the IC daily, and expressed interest in the IC's temporary work program. Dr. Nicol noted plaintiff did well on his current medication without side effects, engaged in self-care activities, and was fully engaged in psychosocial rehabilitation programming. (Tr. 339).

From January 2 through 9, 2010, plaintiff was admitted to the DePaul Health Center because of self-harming behavior, unsafe behavior, suicidality symptoms, and mood symptoms. Plaintiff stated when he thought about the past he wanted to hurt his siblings. (Tr. 547). Plaintiff presented signs of homicidal ideation towards his brother, whom he would like to shoot, although plaintiff did not own a gun but stated guns are for sale at a local store. Plaintiff also claimed he would like to throw acid into his sister's face. (Tr. 547). At the time of admittance, plaintiff had aggressive and self-mutilating behaviors, suicidal symptoms, and homicidal ideas. (Tr. 548). Plaintiff was provided inpatient psychiatric treatment. At the time of discharge, plaintiff had no suicidal ideas, no homicidal ideas, no aggressive thoughts, no endangering behavior, and no debilitating adverse effects. (Tr. 548).

On January 13, 2010, Dr. Nicol found plaintiff suffers from schizoaffective disorder. (Tr. 323). Dr. Nicol found a Global Assessment of Functioning ("GAF") of 65, consistent with only "mild" impairment. (Tr. 323).

On January 18, 2010, Alyssa Trimble, M.A., C.M., prepared a clinical psychological assessment of plaintiff. (Tr. 324-29). Plaintiff reported his current goal was "to get a job." (Tr. 324). Plaintiff attended the IC five days a week, helped out on the third-floor, and communicated with acquaintances at the center. (Tr. 327). Plaintiff was compliant with treatment. (Tr. 328). Plaintiff was to continue community support services from Barnes-Jewish/Christian Behavioral Health ("BJCBH"), continue to see Dr. Nicol every two months, and attend the IC five days a week to increase socialization and

to obtain employment. The assessment referred plaintiff to the BJCBH employment specialist should he be unable to obtain employment thorough the IC. (Tr. 328).

On February 3, 2010, plaintiff reported not sleeping for days. Dr. Nicol noticed plaintiff did not look as if he was sleep deprived. (Tr. 337).

On March 3, 2010, plaintiff reported doing custodial work through the IC work program for approximately 4 hours per day, five days a week. Plaintiff went to the IC and worked out and did well on his current medications. Dr. Nicol recommended he attend social outlets, such as book clubs, to meet people. (Tr. 336).

On November 2, 2010, Aqeeb Ahmad, M.D. of Jennings Medical Center Inc. prepared a consultative psychiatric evaluation of plaintiff. (Tr. 352). Plaintiff complained he was unable to work because of anxiety and his schizoaffective disorder. (Tr. 352). Dr. Ahmad noted plaintiff was never psychiatrically hospitalized. (Tr. 353). Dr. Ahmad gave plaintiff a GAF of about 50, consistent with serious limitations of functioning. (Tr. 354). Dr. Ahmad stated plaintiff would probably not be able to hold a job on a consistent basis because of anxiety, paranoia, social isolation, difficulty getting along with people, and suspiciousness. (Tr. 354).

From December 2 to 9, 2010, plaintiff was hospitalized for suicidal and homicidal thoughts, self-harming behavior, unsafe behavior, suicidality, and mood symptoms. (Tr. 544-60). At admission, he made specific statements of harming his brother and his sister, who he said abused him when he was growing up. (Tr. 547). Plaintiff received therapeutic care. His discharge diagnoses were schizoaffective disorder, unspecified schizophrenia, generalized anxiety disorder, depressive disorder, and unspecified psychosis. (Tr. 548). The discharge summary stated in part:

> The patient's depression, anxiety, stress management skill, impulse/anger control, motivation, understanding of disease and compliance to treatment are improved. The patient continued to have difficulty in motivation. At the time of discharge, the patient had no suicidal ideas, no homicidal ideas, no aggressive thoughts, no endangering behavior and no debilitating adverse effects. The patient agreed on the treatment plan, understood the risk, benefit, alternative treatment, potential consequence of no treatment, and gave informed consent.

(Tr. 548).

On February 3, 2011, Dr. Nicol noted plaintiff, while still dating his girlfriend, began having sexual relations with a man he met at a metro station a few weeks ago. (Tr. 391). Dr. Nicol referred plaintiff for regular psychotherapy. (Tr. 393).

In March through June of 2011, Dr. Nicol noted plaintiff tolerated medications with some residual anxiety and needed assistance linking to alternate psychosocial rehabilitative resources and therapy. (Tr. 396). Dr. Nicol found no acute evidence of psychosis or mood symptoms, found symptom stability with respect to mood and psychotic symptoms, and found plaintiff had ongoing issues with sexual identity. (Tr. 400, 403, 415). Dr. Nicol encouraged plaintiff to schedule an intake for trauma-focused therapy, to do dialectical behavior therapy,[8] and to work with his case manager on identifying appropriate social outlets such as a book club or joining the local YMCA. (Tr. 400, 409, 415). Dr. Nicol stated plaintiff was on the waitlist to receive a dialectical behavior therapist assignment. (Tr. 409).

During plaintiff's visits in July and August 2011, Dr. Nicol noted plaintiff tolerated medications well, had no frank psychotic symptoms, and was stable overall, but continued to struggle with wanting social interaction and had ongoing issues with cognitive function. (Tr. 422, 425). Dr. Nicol suggested plaintiff join the local YMCA for exercise and social engagement and continue attendance at the IC. (Tr. 422). Plaintiff was still on the waiting list for dialectical behavior therapy and was to enroll as soon as a spot opened up. (Tr. 422, 429).

On August 29, 2011, Dr. Nicol noted that plaintiff had been hospitalized due to a presumed suicide attempt by overdose on Ambien. (Tr. 429). Plaintiff called 911 to

---

[8] Dialectical behavior therapy "is a type of cognitive behavioral therapy. It may be used to treat suicidal and other self-destructive behaviors." "It teaches patients skills to cope with, and change, unhealthy behaviors." http://www.webmd.com/mental-health/ dialec-tical-behavioral-therapy#1.

report he had taken twenty Ambien. (Tr. 430). It was unclear whether plaintiff intended suicide by this gesture. (Tr. 429). Plaintiff reported he had no memory of taking an overdose or of feeling suicidal, but thinks he somehow got confused about the medications and perhaps took too many Ambien, then got suicidal afterwards. (Tr. 430). After leaving the hospital, plaintiff resumed regular daily activities, including attending the IC, starting dialectical behavior therapy, and meeting his new therapist. (Tr. 430).

In October 2011, Dr. Nicol noted an apparent mild increase in intermittent depressive symptoms and encouraged plaintiff to use therapy and coaching calls on weekends to address situational depressive symptoms. (Tr. 435). Two weeks later Dr. Nicol noted plaintiff's mood had improved, he made better decisions regarding safety and relationships, and overall he was doing better. (Tr. 438).

From January through March 2012, Dr. Nicol noted plaintiff benefited from psychosocial rehabilitation and individual/group dialectical behavior therapy, though he needed ongoing encouragement. (Tr. 448, 457). Plaintiff also continued to need assistance organizing and processing information. (Tr. 448). Plaintiff's mood variability was likely within normal limits, but ongoing issues with gender identity, interpersonal relationships, self-perception, self-worth, cognitive processing, and mood lability (emotional instability) remained. (Tr. 454, 457). Plaintiff felt tired, depressed, and angry. (Tr. 371). Plaintiff was encouraged to go to the ER if depressive symptoms worsened, but plaintiff declined to do so. (Tr. 373).

In February 2012, plaintiff and his case manager were made aware of an upcoming change in his psychiatrist from Dr. Nicol to Dr. Lauren Flynn. (Tr. 457). Upon plaintiff's first visit with Dr. Flynn in May 2012, she made the same assessment as Dr. Nicol had made at her last visit with plaintiff. (Tr. 460). Plaintiff claimed his anxiety had intensified; however plaintiff was not attending dialectical behavior therapy. (Tr. 468).

On October 22, 2012, Bridget A. Graham, Psy.D., performed a consultative psychological evaluation and estimated plaintiff's intelligence as being in the average to low-average range. (Tr. 487). Plaintiff understood his anxiety problems required

medication management. (Tr. 487). Plaintiff was able to independently care for his personal hygiene and had no difficulty completing household chores such as cleaning, cooking, and laundry. (Tr. 488). Dr. Graham stated plaintiff displayed symptoms consistent with a generalized anxiety disorder. Plaintiff reported gender identity concerns qualifying him for a diagnosis of gender identity disorder, not otherwise specified. Plaintiff demonstrated personality characteristics most consistent with personality disorder, not otherwise specified with paranoid and avoidant personality features. Dr. Graham opined that plaintiff's ability to interact socially, adapt to his environment, and function in a work setting is poor because of his anxiety symptoms, which are complicated by his personality disorder. (Tr. 488). Dr. Graham found a GAF of 55, consistent with moderate limitations of functioning. (Tr. 489).

On December 28, 2012, BJCBH found plaintiff had major depressive disorder which was recurrent and unspecified, gender identity disorder, posttraumatic stress disorder, borderline personality disorder, and a GAF of 49. (Tr. 490).

## ALJ HEARING

On March 25, 2014, plaintiff appeared and testified at a hearing before an ALJ. (Tr. 38). Plaintiff was 36 years old, single, living alone, and had no dependents. (Tr. 44). Plaintiff's attorney stated plaintiff had been diagnosed with schizoaffective disorder, depression, learning disability, hypertension, personality disorder, gender identity disorder, borderline personality disorder, and narrowing in the cervical spine. (Tr. 45-46). Plaintiff stated he takes his medication every day except when he runs out, he sometimes has had help refilling medication and sometimes he does it, and he has gone three to four days before without medication. (Tr. 48-49). Plaintiff stated he has had trouble working because of anxiety, he has two friends, and he can do household chores. (Tr. 57, 59-62). Plaintiff testified he can take care of his personal needs; he goes to the mall once a month just to walk around; and he attends church with a friend. (Tr. 61-63).

Vocational Expert (VE) Delores Gonzales, after reviewing the record, testified plaintiff had worked as a pizza cook, a night cleaner, and a stocker. (Tr. 65). The VE

determined plaintiff could continue his past work as a night cleaner after looking at his medical records and testimony, which suggest: (1) he is functionally limited to light external work; (2) he should avoid ropes, ladders, and scaffolding; (3) he should avoid hazardous heights because of his alleged mental impairment; (4) he is limited to unskilled work; and (5) he should not perform work that includes more than infrequent handling of customer complaints. (Tr. 65). The VE testified that a significant number of other jobs exist that a hypothetical individual with the same education, vocational, and RFC as plaintiff would have the ability to perform. (Tr. 65). These jobs include mail sorter, collator operator, and marker. (Tr. 65-66). All of these positions are available nationally and regionally within Missouri. (Tr. 65-66).

Plaintiff's attorney questioned the VE about adding the following limitations to the ALJ's original hypothetical: the person would be limited to simple, routine, and repetitive tasks; can understand, remember, and carry out short, and simple-short, and simple one to two-step instructions only; must have a low-stress job with no production or time quotas; can have occasional, superficial contacts with coworkers and supervisors; and no more than occasional judgment required on the job. (Tr. 66). The VE stated this individual, with the additional limitations, would not be able to perform plaintiff's past work nor were any jobs available for this individual because a person needs to have constant judgment, not just occasional judgment, when working. (Tr. 67).

DECISION OF THE ALJ

On July 1, 2014, the ALJ found plaintiff not disabled. (Tr. 20). The ALJ found plaintiff had not engaged in substantial gainful activity since May 17, 2012,[9] and has the following severe impairments: degenerative disc disease of the cervical spine, major depressive disorder, and anxiety disorder. (Tr. 22). The ALJ found these are severe impairments, as defined in Social Security Ruling 85-28, since they are more than slight abnormalities having more than a minimal effect on the ability to work. Plaintiff does not

---

[9] Plaintiff had earnings of $3,400 for 2010, which comes to $283 a month. These earnings for 2010 are not at a substantial gainful level. (Tr. 22).

have an impairment or combination of impairments which meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22).

The ALJ found that plaintiff's allegations of the severity of his neck and back pain were not supported by the record. (Tr. 28).

The ALJ found plaintiff has the RFC to perform light work as defined in 20 C.F.R. 416.967(b), except that he can lift and carry only twenty pounds occasionally and only ten pounds frequently; can stand, walk, and sit only six hours each day in an eight-hour workday; must avoid climbing ladders, ropes, or scaffolds; and must avoid working at unprotected heights. Plaintiff can understand, remember, and carry out simple instructions and non-detailed tasks. Plaintiff should not perform work which includes more than infrequent handling of customer complaints. (Tr. 24).

The ALJ found, considering plaintiff's age (34), education (limited, with the ability to communicate in English), work experience, and RFC, that there are jobs that exist in significant numbers in the national economy that he could perform, such as mail sorter, collator operator, and marker II. (Tr. 29-30). The ALJ gave no weight to the VE's response that plaintiff could not work with only occasional judgment, as the hypothetical question was not based on any persuasive evidentiary support. (Tr. 30, 65-68). The ALJ found transferability of job skills is not an issue, because plaintiff does not have past relevant work. (Tr. 29).

Accordingly, the ALJ denied plaintiff's application for SSI benefits because he determined plaintiff is not disabled. (Tr. 31).

## **GENERAL LEGAL PRINCIPLES**

Under 42 U.S.C. § 405(g), an individual may obtain judicial review of the final decision of the Commissioner of Social Security. When reviewing this decision, the court may not reconsider the administrative record and make its own findings of fact about whether a claimant is disabled. *Locker v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). Rather, the court must decide whether the ALJ's decision is based upon

substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). The court "may not reverse… merely because substantial evidence would support a contrary outcome." *Johnson, supra*. Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. *Id.* (citations omitted).

A person is disabled under the Social Security Act, if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

The Social Security Administration has established a five-step process for determining whether a person is disabled. 20 C.F.R. § 416.920. At Step One, the Commissioner decides whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). If so, the claimant is not disabled. If not, as in plaintiff's case, the Commissioner decides at Step Two whether the claimant has a severe impairment or combination of impairments. 20 C.F.R. § 416.920(c). Severe impairment is defined as any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities. *Id*. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at Step Three whether the claimant's impairment meets or is equal to one of the presumed disabling impairments listed in the Commissioner's regulation. 20 C.F.R. § 416.920(d).

If not, the Commissioner asks at Step Four whether the claimant has the RFC to perform his past relevant work. 20 C.F.R. § 416.920(f). A claimant's RFC is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1); *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). The Eighth Circuit has stated that RFC is the ability to do requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy* v. *Schweiker*,

683 F.2d 1138 (8th Cir. 1982) (en banc), *abrogated on other grounds*, 524 U.S. 266 (1998).

If the claimant can perform his past work, he is not disabled. 20 C.F.R. § 404.1520(4)(iv). If he cannot perform his past relevant work, as in plaintiff's case because he had no qualified past relevant work, the burden of proof shifts at Step Five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in significant numbers in the national economy, consistent with the claimant's age, education, and work experience. *Id*. at § 404.1520(4)(v); *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

## **DISCUSSION**

Plaintiff argues that the ALJ's decision is not supported by substantial evidence, because the ALJ failed to properly assess his credibility and failed to discuss evidence that supported disability. Plaintiff argues that the ALJ failed to cite the record indicating routine non-compliance with treatment, such as counseling and taking medication, which affected plaintiff's credibility. Plaintiff also argues the ALJ erred in taking into consideration any of his financial motivation in determining credibility. The court disagrees.

### *Residual Functional Capacity*

Medication compliance, treatment compliance, and financial motivation can relate to the credibility of a claimant's subjective complaints, which in turn can affect the ALJ's RFC determination.

RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2011). A claimant's RFC is the most he can do despite the combined effects of his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physicians' opinions, and a claimant's description of his limitations. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. §§ 404.1545, 416.945(a). The RFC must be supported by some medical evidence of the claimant's

ability to function in the workplace. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). Weighing the evidence is a function of the ALJ as the fact-finder. *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). An administrative decision that is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

Contrary to plaintiff's argument, the fact that the ALJ discounted plaintiff's credibility because of medication compliance, treatment compliance, and financial motivation does not mean the RFC is not supported by medical evidence. The ALJ determined that plaintiff retained the following RFC:

> to perform light work as defined in 20 CFR 416.967(b) except that he can lift and carry twenty pounds occasionally and ten pounds frequently. The claimant can stand, walk, and sit six hours each in an eight-hour workday. The claimant must avoid climbing ladders, ropes, or scaffolds. The claimant must avoid work at unprotected heights. The claimant can understand, remember and carry out at least simple instructions and non-detailed tasks. The claimant should not perform work that includes more than infrequent handling of customer complaints.

(Tr. 24).

In finding plaintiff capable of the above RFC, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of *Polaski*. (Tr. 24). *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *adhered to on remand*, 804 F.2d 456 (8th Cir. 1986), *cert. denied*, 482 U.S. 927 (1987). When making her RFC findings, the ALJ considered plaintiff's hearing testimony (Tr. 25), the report of consultative psychologist Karen Hampton (Tr. 25-26), the BJC Behavioral Health Services records (Tr. 26, 27), the consultative psychiatric report of Dr. Aqeeb Ahmad (Tr. 26), the DePaul Hospitalization records (Tr. 26), and the consultative psychological evaluation of Dr. Bridget Graham (Tr. 27).

*Credibility*

The Commissioner's regulations direct an ALJ to give reasons why, as in this case, she does not fully credit the claimant's testimony. SSR 96-7p;[10] *Polaski*, 739 F.2d at 1322. In this case, the ALJ found plaintiff's complaints were not entirely credible for several specific reasons, including the absence of objective medical evidence supporting his subjective claims; medication and treatment noncompliance; the effectiveness of medication and other treatments when taken as prescribed; plaintiff's poor work record; his daily activities; and inconsistent statements that generally fail to support his allegations.

First, the ALJ pointed to the absence of objective medical evidence that supports the severity of the mental impairment alleged. (Tr. 27). An ALJ may not reject a claimant's subjective complaints solely for lack of objective medical evidence, but may nevertheless consider an absence of objective medical evidence sufficient to support the degree of severity alleged. *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006). In this case, the ALJ stated the medical treatment notes do not document any medical observations, by any treating psychiatrist or psychologist, of significant abnormalities or deficits with respect to plaintiff's mood, affect, thought process, concentration, attention, pace, persistence, social interaction, activities of daily living, speech, psychomotor activity, focus, contact with reality, eye contact, orientation, demeanor, abilities to cope with stress, abilities to work without decompensation, his abilities to understand and follow instructions, judgment, insight, cognitive function, or his behavior. (Tr. 27). The ALJ did not find that the record does not support the existence of some of the

---

[10] SSR 96-7p states that the ALJ must cite "specific reasons," supported by evidence in the record, for a credibility finding. While this SSR was rescinded by SSR 16-3p on March 16, 2016, it was still in force at the time of the ALJ's decision in July 2014. The superseding 2016 ruling rejects the use of the term "credibility," because "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p. However, in terms of the evaluation of symptoms, both rulings direct ALJs to consider all evidence in the record, and both incorporate the factors to be considered under regulations 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). As applied to this case, the rescission of SSR 96-7p has no practical effect on the outcome of this case.

abnormalities or deficits alleged, but that the medical treatment notes do not document findings by a treating psychiatrist or psychologist of any *significant* limitations of function, lasting twelve months in duration and despite treatment. (Tr. 27).

Plaintiff alleges he became disabled in February 2008, and since then he has undergone three psychological examinations in conjunction with his three applications for disability benefits. (Tr. 314-20, 349-55, 482-89). While plaintiff occasionally appeared anxious and agitated, in April 2008 plaintiff was able to understand and recall simple instructions, demonstrated adequate pace and volume of speech, with his concentration only mildly impaired. (Tr. 319-20). In November 2010, plaintiff's speech was logical and sequential, he was fully oriented, and he denied death wishes or assaultive ideations. (Tr. 354). In October 2012, plaintiff was polite and cooperative, his speech and thought content were normal, and he was able to concentrate and give attention to the tasks asked of him. (Tr. 486-87).

Second, the ALJ noted that the medical records document that plaintiff did not comply with his medication therapy. (Tr. 28). Plaintiff argues that this finding is not supported by substantial evidence. The court disagrees. It is proper for an ALJ to consider the claimant's noncompliance with a treating physician's directions, including failing to take prescribed medications. *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006). An ALJ is not required to discuss every piece of evidence submitted. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. *Id*.

There is substantial evidence in the medical record for the ALJ's determination. A BJCBH progress note stated plaintiff had difficulty remembering to take his medication as directed and at times did not take the correct dosage. (Tr. 26, 343). Dr. Nicol noted plaintiff had recurrence of low mood and paranoia, which was likely contributed to by decreased structure and running out of medications. (Tr. 445). Further, at the ALJ hearing plaintiff testified that he takes his medication every day except when he runs out, but that he sometimes doesn't refill his medications without help, and has gone three or

four days before refilling his medications. (Tr. 25, 49). The ALJ lawfully considered whether plaintiff complied with his medication.

Third, the ALJ noted that the records document that, when compliant, plaintiff's symptoms are controlled. (Tr. 28). It is lawful for the ALJ to consider this information; symptoms that are controlled by treatment or medication are not disabling. *Lawson v. Colvin*, 807 F.3d 962, 965 (8th Cir. 2015). The ALJ also stated this affected plaintiff's credibility, because she found it inconsistent for an individual, if truly desirous of work, to repeatedly fail to comply with prescribed treatment for ailments that he feels significantly limit his functional capacity. (Tr. 28).

Additionally, the ALJ found that plaintiff's conservative treatment history undermined his credibility. On February 3, 2011, Dr. Nicol referred plaintiff for regular psychotherapy. (Tr. 393). A month later, Dr. Nicol noted plaintiff had not yet followed the referral. (Tr. 396). On June 2, 2011, Dr. Nicol referred plaintiff to dialectical behavior therapy. (Tr. 409). On August 31, 2012, Dr. Nicol noted plaintiff had not attended dialectical behavior therapy. (Tr. 468). On June 16, 2011, Dr. Nicol noted that she encouraged plaintiff to work with his case manager on identifying appropriate social outlets such as joining the local YMCA. (Tr. 415). A month later at her meeting with plaintiff, Dr. Nicol again suggested plaintiff look into membership at the local YMCA for exercise and social engagement. (Tr. 422).

Further, the ALJ stated that plaintiff alleged an onset date of February 1, 2008, yet the medical record does not document treatment until July 1, 2009, other than a psychological consultative evaluation in April 2008 as a part of the disability application process. (Tr. 25). At this consultative evaluation, Dr. Hampton noted that plaintiff was not receiving treatment nor taking any medication. The first record of plaintiff receiving treatment was in July 2009, seventeen months after the alleged onset date. (Tr. 347). The ALJ's consideration of plaintiff's failure to seek treatment in her credibility determination is supported by the record.

Plaintiff's inpatient hospitalizations in January and December 2010 are not inconsistent with the ALJ's findings that plaintiff's symptoms are controlled with

medication and that he is able to work some jobs. (Tr. 323, 327, 330-32, 336, 337, 352-54, 547).

In this case, the ALJ did not specifically state her reasons for discounting plaintiff's treatment credibility, including plaintiff's inpatient hospitalizations. Although specific statements of credibility findings are preferable, an ALJ's arguable deficiency in opinion-writing technique does not require this court to set aside a finding that is supported by substantial evidence. *Carlson v. Chater*, 74 F.3d 869 (8th Cir. 1996). It is clear from the record that the ALJ made certain implicit determinations regarding plaintiff's credibility. There is substantial evidence in the medical record for the ALJ's finding that plaintiff was non-complaint with treatment recommendations, had a conservative treatment history, and did not seek treatment for a long period of time.

Fourth, the ALJ noted that plaintiff was financially motivated. (Tr. 29). Plaintiff argues the ALJ does not explain how his financial motivation for benefits affected his credibility. If the ALJ gives a good reason for discrediting the claimant's credibility, the court will defer to his judgment even if every factor is not discussed in depth. *Dunahoo*, 241 F.3d at 1038. The ALJ stated plaintiff had sought benefits or privileges and services through multiple agencies and is a repeat filer of applications. (Tr. 29).

The ALJ noted plaintiff had a poor earnings record. (Tr. 29). The ALJ stated plaintiff alleges a disability onset date of February 1, 2008, yet the medical record does not document treatment until July 1, 2009; and treatment from that date on was intermittent and sporadic. (Tr. 29). The ALJ reasoned this affected credibility, because plaintiff appeared to be motivated to qualify for disability benefits. (Tr. 29).

A lack of work history may indicate a lack of motivation to work more than a lack of ability. *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). In examining subjective complaints, it is appropriate for the Commissioner – in the course of giving full consideration to all evidence relating to subjective complaints – to consider a claimant's inconsistent work history or apparent lack of motivation for work. *Priest v. Apfel*, 12 F. App'x 445, 446 (8th Cir. 2001). *See Polaski*, 739 F.2d at 1322. The ALJ lawfully took this information into consideration when determining credibility.

Fifth, the ALJ found plaintiff's daily activities inconsistent with marked or extreme limitations of functioning. (Tr. 29). An ALJ is required to consider a claimant's daily activities when evaluating his credibility. *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011). Daily activities, including taking care of a child, driving a vehicle, preparing meals, performing housework, shopping for groceries, handling money, and visiting family can be considered by ALJs on the issue of disability. *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007); (Tr. 29).

Plaintiff testified at the ALJ hearing that he regularly vacuums, cooks, and does laundry. (Tr. 60, 63). Plaintiff takes care of his own personal hygiene, he goes to the mall to walk around, he interacts with friends and acquaintances, and he visits his grandparents. (Tr. 61-63, 327). Although the record indicates plaintiff did not want to go into stores, he does his own basic shopping. (Tr. 316, 339). A medical visit progress note stated plaintiff had improved hygiene and improved social interactions, such as riding the bus on his own and attending the IC. (Tr. 345). In October 2009, a progress note stated plaintiff attended the IC regularly and used public transportation without problems. (Tr. 342). In December 2009, another progress note stated plaintiff was going to the grocery store alone; the same note stated plaintiff attended the IC daily and expressed interest in its temporary work program. (Tr. 339).

On January 5, 2010, a psychological assessment of plaintiff stated plaintiff attended the IC five days a week; plaintiff helped out on the third-floor; and communicated with acquaintances while at the IC. (Tr. 327). On March 3, 2010, a progress note stated plaintiff did custodial work through the IC and worked for four hours, five days a week. (Tr. 336). In a February 2011 progress note, Dr. Nicol noted plaintiff, while still dating his girlfriend, began to have a relationship with someone he met at a metro station. (Tr. 391). The ALJ lawfully discounted plaintiff's statements that anxiety keeps him from being around people and from working since he testified he goes to the mall to walk; that he has at least one friend and has been in romantic relationships with others; and that he has no difficulties with personal care, household chores, laundry, or cooking.

In sum, upon review of the record, the court concludes that there is substantial evidence in the record to support the ALJ's findings and conclusions.

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

                                                     S/ David D. Noce
                                       **UNITED STATES MAGISTRATE JUDGE**

Signed on March 27, 2017.